United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 14, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 03-50311

---

STEPHEN GREENBERG, Individually and on behalf of all others
similarly situated; AVIEL MARRACHE, Lead Plaintiff; CHARLES
BINKS, Individually and on behalf of all others similarly
situated; RYAN BRISTOL, on behalf of himself and all others
similarly situated; RYAN W. CONNORS, on behalf of himself an all
others similarly situated; PETER MARGONELLI, on behalf of
themselves and all others similarly situated; RANDALL SIMON, on
behalf of themselves and all others similarly situated; ROGER D.
LYNCH, individually and on behalf of all others similarly
situated; MYRNA ALZAGA, Individually and on behalf of all others
simlarly situated; SAM RHOADES, Individually and on behalf of all
others similarly situated; STEVEN WALLERSTIEN, on behalf of all
others similarly situated; ERIC SCHUESSLER, on behalf of himself
and all others similarly situated; IAN GOTLIB, on behalf of
himself and all others similarly situated.

                    Plaintiffs-Appellants,

        v.

CROSSROADS SYSTEMS, INC.; BRIAN R. SMITH; REAGAN Y. SAKAI; JOHN
R. MIDDLETON,

                    Defendants-Appellees.

---

Appeal from the United States District Court
for the Western District of Texas

---

Before DAVIS, WIENER, and STEWART, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

    Purchasers of Crossroads Systems, Inc. stock between January

25, 2000, and August 24, 2000, filed this putative class action

-1-

against Crossroads and three of its officers seeking recovery for securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5. The action is based on several statements made by defendants relating to the capabilities of Crossroads's products and financial results for the first three quarters of Fiscal Year 2000. The defendants moved for partial summary judgment on the ground that the plaintiffs cannot establish reliance on any of Crossroads's alleged false statements under the theory of fraud-on-the-market. We agree with the district court's analysis as to most of the alleged false statements but disagree with respect to the allegedly false statements made on 24 May 2000, 6 June 2000, 12 June 2000, and 5 July 2000. We therefore vacate the summary judgment as to these latter statements and remand for further proceedings.

## I.

Crossroads is a public company based in Austin, Texas, that designs, manufactures, and sells storage routers.[1] On January 25, 2000, Crossroads announced that production was beginning on its "Third Generation" of storage routers, comprised of models 4150, 4250, and 4450. The release included details on several features of the new line of routers, such as interoperability, increased speed, and server-free backup. Over the next several months,

---

[1] Storage routers are devices that relieve congestion within computer networks and reduce the time to back-up electronic information.

Crossroads made additional more statements concerning the capabilities of its Third Generation line of routers. On July 27, 2000, Crossroads released multiple items of unfavorable news, including the news that Crossroads had issued a temporary stop-ship of its products because of interoperability problems. After the July 27 release, the price of Crossroads stock fell by about one-half.

In February, 2001, the plaintiffs filed this private securities fraud class action on behalf of purchasers of Systems, Inc. (Crossroads) common stock between January 25, 2000, and August 24, 2000 (the "Class Period"), alleging violations by Crossroads and its principal executives of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The Plaintiffs alleged that during the Class Period Crossroads made several material public misrepresentations overstating the interoperability and other capabilities of its router products that tended to inflate the price of the company's stock. In addition, the plaintiffs alleged that Crossroads overstated the company's financial results during the class period.[2] Plaintiffs also alleged that the "truth" about these statements was revealed on 27 July 2000 and 24 August 2000, causing the price of Crossroads stock to decline sharply.

---

[2] Plaintiffs alleged that Crossroads made these misrepresentations on 25 January 2000, 7 February 2000, 22 February 2000, 23 February 2000, 27 March 2000, 19 April 2000, 23 May 2000, 24 May 2000, 6 June 2000, 12 June 2000, 14 June 2000, 20 June 2000, 27 June 2000, 5 July 2000, 13 July 2000.

The Defendants filed a motion to dismiss under Rule 12(b)(6). The district court denied this motion on August 15, 2001. In September of 2001, this court issued its opinion in *Nathenson v. Zonagen, Inc.*, 267 F.3d 400 (5th Cir. 2001), which clarified, *inter alia*, the rule in this circuit concerning the proof required to establish reliance in a securities fraud case based on fraud-on-the-market. After completing discovery and deposing the lead plaintiff, Crossroads filed a motion for partial summary judgment arguing that under *Nathenson* the plaintiffs were not entitled to a presumption of reliance under the fraud-on-the-market theory of their case. The district court held that under *Nathenson*, plaintiffs asserting a fraud-on-the-market theory are not entitled to the presumption of reliance where the alleged misrepresentations do not affect the market price of the stock. The district court concluded that an efficient market will digest unexpected new information within two days of its release. The district court used this two-day window to determine whether the alleged misrepresentations sufficiently affected the price of Crossroads stock so that the plaintiffs would be entitled to the fraud-on-the-market presumption of reliance.[3] For various reasons discussed below, the district court concluded that the plaintiffs were not entitled to the presumption of reliance for any of the alleged

---

[3] The plaintiffs do not challenge the use of this two-day window.

-4-

misrepresentations. The district court then designated this partial summary judgment a final judgment and dismissed the plaintiffs case.

## II.

We review the district court's grant of summary judgment de novo, considering all evidence in a light most favorable to the non-movant. *Campos v. City of Houston*, 113 F.3d 544, 545 (5th Cir. 1997). Summary judgment will be affirmed where, after independent review, there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law. *Walker v. Thompson*, 214 F.3d 615, 624 (5th Cir. 2000). Summary judgment may be affirmed on any basis supported by the record. *Conkling v. Turner*, 138 F.3d 577 (5th Cir. 1998).

## III.

To state a private securities fraud claim under § 10(b)[4] and Rule 10b-5,[5] "a plaintiff must allege, in connection with the

---

[4] Section 10(b) provides, in pertinent part:

> It shall be unlawful for any person, directly or indirectly . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe a necessary or appropriate in the public interest or for the protection of investors.
> 15 U.S.C. § 78j(b).

[5] Rule 10b-5 provides, in pertinent part:

purchase or sale of securities, (1) a misstatement or an omission (2) of material fact, (3) made with scienter (4) <u>on which plaintiff relied</u> (5) that proximately caused [the plaintiffs'] injury." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001) (quotation omitted) (emphasis added). The Supreme Court recognized that requiring proof of "actual reliance" in class actions was unduly burdensome because of the obvious difficulty of showing that every class member individually relied on the alleged misstatement. To ease this burden the Supreme Court, in *Basic v. Levinson*, recognized the securities fraud theory of fraud-on-the-market. 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Under this theory, reliance on the statement is rebuttably presumed if the plaintiffs can show that (1) the defendant made public material misrepresentations, (2) the defendant's shares were traded in an efficient market, and (3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed. *Id*. at 247 n. 27, 108 S.Ct. 978.[6]   The Defendants may

---

It shall be unlawful for any person, directly or indirectly . . .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances, not misleading . . . in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5.

[6] Under this theory, where securities are traded in an efficient market, it is assumed that all public information concerning a company is known to the market and reflected in the

rebut this presumption by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at fair market price[.]" *Id*. at 247, 108 S.Ct. 978.

During the discovery phase of the instant case, this court issued its opinion in *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001), where we stated,

> *Basic* plainly states that the presumption of reliance may be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff." This would include a showing that "the market price would not have been affected by" the alleged "misrepresentations," as in such a case "the basis for finding that the fraud had been transmitted through market price would be gone."

*Nathenson*, 267 F.3d at 414 (citations omitted). Accordingly, *Nathenson* held that "in cases depending on fraud-on-the-market theory, [] the complained of misrepresentation or omission [must] have actually affected the market price of the stock[.]" Id. at 415. The *Nathenson* plaintiffs could not show that the price of Zonagen's stock was actually affected by the allegedly false statements, either by showing an increase in price following the allegedly false positive statements or a corresponding decrease in price following the revelation of the misleading nature of these

---

market price of the company's stock. Therefore, when someone purchases a company's stock in an efficient market, we can presume that he relied "on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price[.]" *Blackie v. Barrack*, 524 F.2d 891, 907 (9th Cir. 1975).

statements.  As such, the plaintiffs were not entitled to the fraud-on-the-market presumption of reliance.

Crossroads moved for partial summary judgment on the issue of presumption of reliance based on *Nathenson*'s requirement of an actual effect on stock price.  The district court noted that the price of Crossroads stock either declined or did not increase in a statistically significant manner in the two days following the alleged misrepresentations made on 25 January 2000, 22 February 2000, 23 February 2000, 24 March 2000, 27 March 2000, 19 April 2000, 23 May 2000, 24 May 2000, 6 June 2000, 12 June 2000, 14 June 2000, 20 June 2000, 27 June 2000, 5 July 2000, and 13 July 2000. The lack of stock price movement led the district court to conclude that under *Nathenson* the plaintiffs were not entitled to the presumption of reliance for the statements made on these days.  The district court further found that the release of the "truth" of these allegedly false statements on 27 July 2000 and 24 August 2000 was not evidence that the stock price had actually been affected by those statements because the decline in price following both of these dates was statistically insignificant.  In reaching this conclusion the district court compared the overall decline in stock price between the first day of the Class Period and the day before the July 27 release.[7]  Because decline in stock price during the

---

[7] The district court found that the price dropped from $13.44 to $5.00 after the July 27 announcement and from $12.62 to $9.00 after the August 24 announcement.  On the other hand, the

-8-

Class Period was, respectively, almost 800% and 1900% greater than that following the release of the "truthful" information, the district court concluded that the decline in price following 27 July 2000 and 24 August 2000 was not statistically significant.

IV.

The plaintiffs argue that the district court erred in finding that they were not entitled to the fraud-on-the-market presumption of reliance for each of the allegedly false statements made by Crossroads during the Class Period. The plaintiffs concede that by looking only to the two-day change following these dates they cannot show that the price of Crossroads stock increased in a statistically significant manner. However, the plaintiffs argue that *Nathenson* allows them to benefit from the presumption of reliance if it can be shown that "special circumstances" prevented the price from otherwise rising.

The plaintiffs argument centers around the following statement from Nathenson:

> <u>We also realize that in certain special circumstances</u>
> <u>public statements falsely stating information which is</u>
> <u>important to the value of a company's stock traded on an</u>
> <u>efficient market may affect the price of the stock even</u>
> <u>though the stock's market price does not soon thereafter</u>
> <u>change</u>. For example, if the market believes the company
> will earn $1.00 a share and this belief is reflected in

price of the stock fell from $80.75 on January 25 to $13.44 on July 26. The court pointed out that the $67.31 drop between the first day of the class and the day before the July 27 announcement was 798% greater than the drop in the two days after the July 27 announcement, and it was 1962% greater than the drop in the two days after the August 24 announcement.

> the share price, then the share price may well not change when the company reports that it has indeed earned $1.00 a share even though the report is false in that the company has actually lost money (presumably when that loss is disclosed the share price will fall).

267 F.3d at 419 (emphasis added).

The plaintiffs argue that this statement somehow relieves them of their burden in a fraud-on-the-market case to show that a stock's price was actually affected by an allegedly false statement. We do not agree. This example merely recognizes a market reality that a stock's price will not change upon the release of confirmatory information, i.e., information already known to the market. This reality, however, is immaterial to the question of reliance in 10b-5 fraud claims. Reliance is an indispensable element of any fraud claim because it provides the "causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic*, 485 U.S. at 423. The fact that a market will not double-count the same information does not establish a nexus between misrepresentation and injury, especially in the context of fraud-on-the-market where we allow this relationship to be proved indirectly. A causal relationship between the statement and actual movement of the stock price is still required. Indeed, the example itself notes that when the "truth" is revealed "the share price will fall." *Nathenson,* 267 F.3d at 419. It is this *actual movement* of stock price which must be shown by fraud-on-the-market plaintiffs, and a plaintiff cannot

relieve himself of this obligation by referring to "special circumstances" in an attempt to explain non-movement of the stock price. *Id.* For these reasons, we reject the plaintiffs argument that a showing of "special circumstances" will entitle them to the presumption of reliance.

V.

On 27 July 2000, Crossroads released several items of very negative news. The release stated, in pertinent part:

> The company believes that revenues for the [third] quarter may be as much as two-thirds below revenues for the prior quarter.
> 
> \* \* \*
> 
> One of the Company's largest customers will not be ordering at the end of this quarter due to an imbalance in its inventory as it transitions to new products. To address this, Crossroads and the customer have agreed to a one-time rebalancing of inventory and movement to Crossroads newer products.
> 
> During the fiscal third quarter Crossroads' products experienced interoperability issues in certain SAN configurations and in mid-July the Company issued a stop ship as a precaution. A correction is in the final stages of testing and is scheduled to be released shortly.
> 
> \* \* \*
> 
> Finally, Compaq informed the Company late in July of its plan to transition out of the Crossroads' 4100/4200 router solutions by the end of this calendar year and replace them with Compaq's own solution.

Following this statement, the price of Crossroads stock declined almost 63%, from $13.44 to $5.00. The plaintiffs argue that the district court erred in concluding that the decline in price following this statement was not statistically significant.

-11-

Furthermore, the plaintiffs argue that this statement revealed the falsity of Crossroads's previous statements and that the ensuing decline sufficiently demonstrates that the price of Crossroad stock was artificially inflated, or propped up, by those previous statements.

1.

We first consider whether the district court erred in concluding that the drop in stock price following the statement on 27 July 2000 was not statistically significant. In reaching this conclusion, the district court compared the dollar difference between the drop in price following the 27 July 2000 announcement and the overall decline in price during the Class Period. The district court found it significant that following the 27 July 2000 release Crossroads stock price dropped from $13.44 to $5.00, a decline of $8.44, while the price of the stock fell from $80.75 to $13.44, a decline of $67.31, during the total Class Period prior to the 27 July 2000 release. The district court compared these two declines and concluded that the decline following the 27 July 2000 statement was not statistically significant because the overall decline in stock price during the Class Period was 798% greater than the decline following 27 July 2000. The district court relied on *Ieradi v. Mylan Laboratories, Inc.*, 230 F.3d 594, 600 (3d Cir. 2000), where the Third Circuit came to a similar conclusion when the overall drop in share price immediately prior to the alleged

-12-

revelation of the "truth" was only 300% greater than the drop in share price in the two days after the "truth" was revealed.

The plaintiffs argue that the district court erred in determining the significance of the decline by comparing the decline following 27 July 2000 to the total decline in stock price during the Class Period.[8]  The plaintiffs argue that the proper method for determining whether a drop in price is statistically significant is to consider the percentage of value lost following the revelation of the "truthful" information.  The plaintiffs point out that under the district court's reasoning, even if the price of the stock dropped 100%, from $13.44 to zero, it would still not be statistically significant.

We find the district court's reliance on *Ieradi* to be misplaced.  First, the portion of *Ieradi* relied upon by the district court concerns the question of materiality.  230 F.3d at 599-600.  The fraud-on-the-market presumption addresses reliance, not materiality, and the two elements are fundamentally different. *Nathenson*, 267 F.3d at 418.  Second, as the plaintiffs point out, under the district court's method even if Crossroads's stock had lost all its value following the 27 July 2000 statement, that loss of $13.44 would still not be considered statistically significant

---

[8] The plaintiffs make the same claims regarding Crossroads's release of its final third quarter numbers on 24 August 2000. However, because the 24 August 2000 release is confirmatory, the fate of the plaintiffs claims based on this statement are tied to that of the 27 July 2000 release.

-13-

because of the much larger decline of $67.31 during the overall Class Period. Indeed, in that situation the overall decline would still be 500% greater than that following 27 July 2000. But the question is one of causation, and we believe the focus should be on the change in price following the release of the "truthful" information. In this case, where the price of the stock fell 63% within two days after the information was released, we find the district court erred in concluding that this was not a statistically significant drop in price.[9]

2.

We next consider the plaintiffs argument that the significant decline in stock price following the 27 July 2000 statement is evidence that the price had been inflated by Crossroads's earlier statements. As we have noted, the main concern when determining whether a plaintiff is entitled to the presumption of reliance is the causal connection between the allegedly false statement and its effect on a company's stock price. *Nathenson* makes it clear that to establish this nexus the plaintiffs must be able to show that the stock price was actually affected. 267 F.3d at 418-419. This is ordinarily shown by an increase in stock price immediately

---

[9] We realize that whether a drop in a stock's price is statistically significant will vary depending on the average trading range for that particular stock. A drop of 10% for a volatile stock may not be statistically significant whereas the same drop for a stock with little average movement may be significant. However, we have no difficulty saying that a 63% drop in this stock following the release of this information was statistically significant.

-14-

following the release of positive information.  We read *Nathenson* to also allow plaintiffs to make this showing by reference to actual negative movement in stock price following the release of the alleged "truth" of the earlier misrepresentation.  *Id*. at 417-419.  *Nathenson* repeatedly emphasizes that the plaintiffs were not entitled to the presumption of reliance because the price of the defendants' stock did not decline upon revelation that the earlier positive statements were misleading.  *Id*. at 417-419.  Because in *Nathenson* there was no decline in price following the release of the alleged 'truth,' *Nathenson* had no reason to explain the requirements for succeeding on a claim where such a decline occurred.

We are satisfied that plaintiffs cannot trigger the presumption of reliance by simply offering evidence of any decrease in price following the release of negative information. Such evidence does not raise an inference that the stock's price was actually affected by an earlier release of positive information. To raise an inference through a decline in stock price that an earlier false, positive statement actually affected a stock's price, the plaintiffs must show that the false statement causing the increase was related to the statement causing the decrease. Without such a showing there is no basis for presuming reliance by the plaintiffs.  A similar problem arises where multiple items of negative information are released on the same day.  For example, a

company may make a false statement and later reveal the falsity of that statement and at the same time release other unrelated negative information. In this situation, to trigger the presumption plaintiffs must demonstrate that there is a reasonable likelihood that the cause of the decline in price is due to the revelation of the truth and not the release of the unrelated negative information. In the absence of such a showing the invocation of the presumption of reliance would be based solely on speculation.

Finally, it is necessary that the earlier positive misrepresentation not be confirmatory. As we noted in our example in *Nathenson*, 267 F.3d at 419, confirmatory information has already been digested by the market and will not cause a change in stock price. Because the presumption of reliance is based upon *actual movement* of the stock price, confirmatory information cannot be the basis for a fraud-on-the-market claim.

In sum, in order for plaintiffs to show that a stock's price was actually affected through evidence of a significant price decrease following the revelation of the alleged "truth" of earlier false statements, plaintiffs must demonstrate: (1) that the negative "truthful" information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that it was this negative statement, and not other unrelated negative

-16-

statements, that caused a significant amount of the decline.

A.

Turning to the summary judgment evidence in this case, we first consider whether evidence of the drop in price following the 27 July 2000 statement raises an inference that the price of Crossroad stock was actually affected by Crossroads's earlier statements regarding the features of its products. Of the alleged misrepresentations made by Crossroads regarding the features of its products, only those made on 25 January 2000, 23 February 2000, 20 June 2000, 14 June 2000, and 27 June 2000 are non-confirmatory and therefore actionable.[10]

On 25 January 2000,[11] 14 June 2000,[12] and 27 June 2000[13]

_____

[10] On 22 February 2000, Crossroads issued a press release which stated, "As planned, Crossroads began production shipments of its 4x50 line of high-performance, Fibre-Channel storage routers." This statement is confirmatory, it merely notes that Crossroads was doing what it had said it would in the 25 January 2000 announcement. As discussed earlier, confirmatory statements do not affect the price of a company's stock and cannot be the basis for a fraud-on-the-market claim.

[11] On this date Crossroads released the news that it was beginning production of its Third Generation of storage routers. The release stated, in pertinent part, "Crossroads Systems Inc. . . . today announced the availability of the entire 4x50 line of Fibre-Channel-SCSI storage routers, which includes the 4150, 4250 and 4450 models. . . . Each Crossroads router has an Ethernet port which enables the router to interoperate with enterprise level management software."

[12] On this date, Crossroads announced its participation in an interoperability certification program for storage router vendors run by Sun Microsystems. The press release stated, in pertinent part, that "Crossroads is working with the certified partners to provide pervasive SAN interoperability. . . . Since 1998, our SAN interoperability lab has tested and verified more

-17-

Crossroads made non-confirmatory, positive statements (that were allegedly false) concerning the interoperability of its new line of routers.  The 27 July 2000 statement specifically revealed the interoperability problems Crossroads was having with its routers. The plaintiffs have therefore shown that the 'positive' statements and the 27 July 2000 'negative, truthful' statement are related. But the plaintiffs are faced with the additional problem that the 27 July 2000 announcement included other unrelated negative information in addition to information relating to interoperability problems.  Specifically, the statement informed the market that one of Crossroads's biggest customers, Compaq, would no longer be a customer because it was developing its own line of routers, that another large customer, StorageTek, would not be ordering any new routers because of an overstock in inventory of Crossroads's older routers, and that Crossroads's third quarter earnings would be almost two-thirds below analysts estimates. Comparing the relative seriousness of all the information released in the 27 July 2000 statement, the news that Crossroads had ordered a *temporary* stop-ship of its products is by far the least negative information

---

than 3,500 solutions.  Our commitment to this certification process is another way Crossroads demonstrates its role as a leader in providing interoperable SAN solutions."

[13] On this date, Crossroads announced that it had entered into an agreement whereby Crossroads 4x50 routers would be integrated into a larger library storage system manufactured by JVC.  The release stated, in pertinent part, that this new relationship "demonstrate[s] Crossroads' ability to interconnect a wide variety of storage devices in the SAN."

released that day. Temporary glitches in technology products are by no means a rare or devastating occurrence. Thus, in order for the plaintiffs to trigger the reliance presumption they must demonstrate the likelihood that the 27 July 2000 interoperability statements played a significant role in the decline in stock price. The plaintiffs have not done so, either in their Complaint or through their expert, Dr. Hakala. In the face of the more serious negative statements unrelated to interoperability and without any explanation by the plaintiffs, we conclude that a fact finder could not find that the news regarding temporary interoperability problems played a significant role in the decline in price following the 27 July 2000 statement. For these reasons, the statements regarding the interoperability of Crossroads's routers cannot form the basis for a fraud-on-the-market claim.

The plaintiffs allege that Crossroads's 23 February 2000 statement falsely reported on the speed of its new routers.[14] The plaintiffs allege that this statement was false and misleading because at the time it was made performance tests had not yet been run to verify its accuracy. The negative information released on 27 July 2000, however, makes no reference to increased router speed. Without a showing that the allegedly false, positive information was related to the negative information released on 27

---

[14] On this day S.G. Cowen issued a report in which Crossroads stated that the new line of 4x50 routers "provides twice the through put compared to the 4200 [line]."

July 2000, the plaintiffs cannot demonstrate that this statement artificially inflated the price of Crossroads stock. This statement cannot form the basis of a fraud-on-the-market claim.

The plaintiffs allege that Crossroads's 20 June 2000 statement falsely reported that 'server-free backup' was now available on its 4x50 line of routers.[15] The plaintiffs allege this statement was misleading because server-free backup was not available on the 4x50 line of routers when this release was issued. Again, however, the negative information released on 27 July 2000 makes no mention of server-free backup or the lack of its availability on the new routers. Without a showing that the allegedly false positive information was related to the negative information released on 27 July 2000, the plaintiffs cannot demonstrate that this statement artificially inflated the price of Crossroad stock. This statement cannot form the basis for a fraud-on-the-market claim.

B.

We next consider whether the drop in price following the 27 July 2000 statement may be used to show that Crossroads's stock price was actually affected by the financial statements made by

---

[15] On this day a Crossroads press release stated, in pertinent part:

Server-Free Backup is the next 'killer-app' for SANs that further leverages our customers' current SAN investments. . . . This technology is an integral facet of our 4250 and 4450 storage routers as it allows our customers to free their server resources, run mission-critical applications and virtually eliminate the backup window.

-20-

Crossroads directly and to analysts. Of the allegedly false financial statements made by Crossroads, only those made on 22 February 2000, 23 February 2000, 24 May 2000, 12 June 2000, and 5 July 2000 are non-confirmatory and therefore actionable.[16]

The statements made on 22 February 2000[17] and 23 February 2000[18] reported Crossroads's financial results for the first quarter of Fiscal Year 2000 and detailed analysts earnings estimates for the fiscal second quarter. The 27 July 2000 statement states only that "revenues for the [third] quarter may be as much as two-thirds below revenues for the prior quarter." The release does not report

---

[16] On 27 March 2000, Crossroads's CEO was quoted in Dow Jones Newswires as stating that he was "comfortable with analysts' estimates that the company's revenue will rise 20%, quarter to quarter, in Fiscal 2000." This statement merely confirms the estimates made by analysts at S.G. Cowen Securities Inc. and Needham & Co. on 23 February 2000.
    On 19 April 2000, S.G. Cowen Securities Inc. issued another report reaffirming its estimates of 20% growth from quarter to quarter. This too confirms the analysts' statements made on 23 February 2000.
    On 23 May 2000, Crossroads issued its financial results for the second fiscal quarter, ended 30 April 2000. Crossroads's earnings were in line with analysts' estimates made on 23 February 2000. This is the classic example of confirmatory information. The market expected Crossroads to report a certain level of earnings, and those estimates proved to be accurate.

[17] On this day Crossroads reported its financial results for the first quarter of Fiscal Year 2000, ended 31 January 2000. The results were positive, with total revenues 12% higher than analysts estimates. In addition, Crossroads posted a loss of only $0.01 per share versus analysts estimates of a $0.07 per share loss.

[18] On this day, Needham & Co. and S.G. Cowen Securities Inc. reported Crossroads first quarter earnings. These analysts also revised upward their earnings estimates for Crossroads in the second fiscal quarter.

any concern that Crossroads's first and second quarter earnings may be incorrect. Moreover, the 27 July 2000 release makes no reference at all to Crossroads's first and second fiscal quarters. Because there is no relationship between the statement made on 27 July 2000 and those made on 22 February 2000 and 23 February 2000, Crossroads's statements on these days cannot form the basis for a fraud-on-the-market claim.

The allegedly false statements made on 24 May 2000,[19] 6 June 2000,[20] 12 June 2000,[21] and 5 July 2000[22] all concerned Crossroads's earnings for the third quarter of Fiscal Year 2000. Because the 27 July 2000 release clearly concerned a significant revenue shortfall

[19] On this day S.G. Cowen Securities Inc. released a report on Crossroads in which they revised upward their previous earnings estimates for the fiscal third quarter.

[20] On this day analysts from Needham & Co. participated in a series of meetings with Crossroads's management. In these meetings Crossroads's management stated that it was confident that the company would meet and possibly exceed the estimated third quarter revenues.

[21] On this day Needham & Co. released a report on Crossroads. In this report, Needham & Co. adjusted upward their estimates for Crossroads's expected revenue in the third quarter of 2000. In addition, the report stated that after talking with Crossroads's management, Needham & Co. thought "that Crossroads should at least maintain, and could potentially achieve a reacceleration of sequential quarterly revenue growth[.]"

[22] On this day Dain Rauscher Wessels released a report on Crossroads based upon information learned at a recent meeting with Crossroads's management. During that meeting, Crossroads's management told Dain Rauscher Wessels analysts that it had 45%-50% of its business left to close for the third quarter ending 31 July 2000.

for Crossroads's third fiscal quarter, the plaintiffs have shown the requisite link between the 27 July 2000 negative information and the earlier statements. The plaintiffs, however, are again faced with the additional problem that the 27 July 2000 announcement included negative information that was unrelated to the earnings shortfall. The plaintiffs offer no evidence or analysis tending to show that the drop in price following the 27 July 2000 release was likely caused by the negative financial news. However, unlike the news of temporary interoperability problems, we are persuaded the news that a company's revenue will be 66% below estimates satisfies the plaintiffs burden. News that a company's earnings will be two-thirds short of analysts estimates is the type of negative information most likely to cause a sharp decline in stock price. For these reasons, we find that Crossroads's statements on 24 May 2000,6 June 2000, 12 June 2000, and 5 July 2000 may form the basis for the plaintiffs fraud-on-the-market claim.

## VI.

We next consider the only purportedly false statement alleged in the plaintiffs Complaint which was followed by a significant increase in stock price. On 7 February 2000 Crossroads announced a worldwide agreement with Hitachi Data Systems to resell Crossroads's older 4x00 model router. The release stated, in pertinent part:

Crossroads welcomes the opportunity to work with Hitachi

-23-

Data Systems to provide Hitachi customers the ability to quickly and easily reap the benefits a SAN can offer. . . The unique interoperability feature of Crossroads' storage routers coupled with the strength of each members product will bring smooth installation and optimal performance within an organization's infrastructure.

In the two days following this statement, the price of Crossroads stock rose from $109.75 to $163.25, and the district court found that this was a statistically significant rise in price. However, as the district court pointed out, the plaintiffs Complaint alleges that this statement was misleading because the 4x50 routers--not the 4x00 routers--were not interoperable. The district court observed that this information, that the 4x50 routers were 'interoperable,' had been released to the market on 25 January 2000 and was therefore confirmatory. As such, the district court concluded that the increase in price could not have been due to the allegedly false claim of 'interoperability.'

The plaintiffs do not dispute that their Complaint alleges that the 7 February 2000 statement was misleading because the 4x50 routers were not interoperable. The plaintiffs argue, however, that evidence offered by Crossroads on summary judgment proves that the statement really concerned the older 4x00 routers. Therefore, the plaintiffs argue that their mistake in pleading should be excused because "the evidence controls" over the complaint. The plaintiffs further argue that they sufficiently alleged the interoperability problems of the 4x00 routers in their Complaint.

This argument made by the plaintiffs was not presented to the

district court in opposition to the defendants motion for partial summary judgment. Arguments not raised in the district court cannot be asserted for the first time on appeal. *FDIC v. Mijalis*, 15 F.3d 1314, 1326-27 (5th Cir. 1994); *Stokes v. Emerson Electric Co.*, 217 F.3d 353, 358 n. 19 (5th Cir. 2000). This is especially true where the assertion first raised on appeal is factual. *DeBardeleben v. Cummings*, 453 F.2d 320, 324 (5th Cir. 1972) ("Where the moving papers do not reveal the presence of a factual controversy on a material issue, the adversary cannot simply assent by silence to the factual theory presented in the motion-and on which the parties stand in the Trial Court-and then assert thereafter on appeal as grounds for reversal a purported factual disagreement never before revealed.").

Accepting the facts as they were presented to the district court, we find the district court did not err in concluding that the allegedly false claim of interoperability on 7 February 2000 was confirmatory. This information had previously been released to the market in Crossroads's statement on 25 January 2000. As we have noted, confirmatory information does not actually affect the stock price. Accordingly, the 7 February 2000 statement cannot form the basis of the plaintiffs fraud-on-the-market claim.

## VII.

We next consider the allegedly false statements made by Brian Smith, CEO of Crossroads, on 13 July 2000. The price of Crossroads

stock had declined at a steady pace in the weeks prior to this statement. On 13 July 2000 the Dow Jones Newswire reported that Smith, when asked about the recent stock decline, stated "that the company . . . had made no announcements and had planned none that might explain the pattern." Smith also "speculated that the recent stock declines . . . could be the result of fears that early investors with large stakes may start selling their shares." The plaintiffs claim this comment was false and misleading because Smith knew that the real reason for the decline was the interoperability problems Crossroads was having with its routers and the pending return of $1.1 million in outdated inventory by StorageTek.

A statement of belief is only open to objection where the evidence shows that the speaker did not in fact hold that belief and the statement made asserted something false or misleading about the subject matter. *Virginia Bankshares, Inc. V. Sandberg*, 501 U.S. 1083,1095-1096 (1991). Assuming, without deciding, the plaintiffs have sufficiently shown that Smith did not actually believe his statement, the plaintiffs still cannot survive summary judgment on this claim because the plaintiffs have not shown the statement was false. In order for the plaintiffs allegation to be true (and for Smith's statement to be false) it is necessary that the decline in stock price prior to Smith's 13 July 2000 statement have actually been caused by the negative interoperability and

inventory information.  The plaintiffs, however, have offered no evidence that the market learned of this information at any time prior to its release on 27 July 2000, two weeks after Smith's statement.  The plaintiffs claim is supported by nothing more than an unsubstantiated conclusory statement.  Such statements are not competent summary judgment evidence. *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir. 1993) ("Unsubstantiated assertions are not competent summary judgment evidence"); *Hugh Symons Group, PLC v. Motorola, Inc.*, 292 F.3d 466, 470 (5th Cir. 2002) (conclusory statements are not sufficient to successfully oppose a motion for summary judgment).  For these reasons, the district court correctly granted summary judgment as to the statement made on 13 July 2000.

## VIII.

For the reasons stated above, we find the statements made by Crossroads on 25 January 2000, 22 February 2000, 23 February 2000, 27 March 2000, 19 April 2000, 23 May 200, 14 June 2000, 20 June 2000, 27 June 2000, and 13 July 2000 may not form the basis of a fraud-on-the-market claim.  Accordingly, for these statements the district court's grant of summary judgment is affirmed.  We find that the plaintiffs may maintain a fraud-on-the-market claim with respect to the statements made by Crossroads on 24 May 2000, 6 June 2000, 12 June 2000, and 5 July 2000.  Accordingly, for these statements the district court's grant of summary judgement is vacated, and this case is remanded to the district court for

further proceedings.

AFFIRMED in part, VACATED in part, and REMANDED.